May it please the court, my name is Chris Stanislavski. On behalf of the petitioner, I'm with the Northwest Immigrant Rights Project. I would request to reserve three minutes of my time. You'll have to keep track of your own time. Understood, Your Honor. The agency committed a reversible error on a number of issues in the case, several of which the respondent does not attempt to defend in its answering brief. Counsel, I'd like to point you to what, just speaking for myself, is a pivot point in this case. And that is whether the substantial evidence supports the determination that the Honduran government is neither unable nor unwilling to control the gang. And there certainly is evidence in both directions in this record. When there's evidence in both directions, even if we would have made a different choice, why is it your position that every reasonable fact finder would have to agree with your position on that issue? I would like to start by just pointing out that I think the bigger legal issue there is that the agency applied an incorrect standard for reviewing that, effectively just focusing on whether the government was willing to. But to respond to your principal question there, I think that while there is kind of- I'm sorry, where do you see that? I'm looking at AR-5 where the BIA says the immigration judge correctly determined that respondent did not show that the M-18 gang is aligned with the Honduran government or that the government is unable or unwilling to control the gang, and then it goes on to discuss. So why do you think that they didn't look at both prongs? And I recognize that the board used the language, unable, in its decision. However, the authority that it cites from this court immediately after, I think, clearly reflects that the agency was effectively reading out that latter half of the standard. Well, it's not so much the authority but the parentheticals, one of which is, quote, the infliction of suffering or harm under government sanction, which is not the right standard, and the other is, quote, noting that violence or discrimination inflicted by private actors does not constitute persecution or the act is not condoned by the government, and if the government takes reasonable steps to prevent and respond to it, both of which seem to read out the unable. That's right, Gunnar. I misspoke. I don't actually know what the cases themselves hold. I haven't looked back at it. But this is what they characterized in this holding. That's true. But the BIA goes on to say that the documentary evidence goes both ways. It also indicates that the government has made efforts to curb corruption and to reduce gang violence, although significant challenges remain. So that has to do with unable. They're doing something about it. I would argue that the government doing something about it without examining the efficacy as required by this court under Madrigal. But then it looks at the efficacy in his particular case. I mean, I think what's striking about this is that when at least one event happened, the police showed up and saved this client's life, and they got there faster than I've ever seen the Portland police get anywhere. So that deals, I think, both with willingness and ability, doesn't it? I think that incident that you're referring to, specifically when the police happened upon the shooters, they were ---- And scared them away, and he testified that, you know, they really don't want to have to confront the police. They're going to go away if the police are there. They certainly didn't want to stick around to be arrested, but that was after they had shot 30 times, which I think is severe harm in and of itself. But you have to separate out the harm from the government's willingness and ability to deal with the harm. They don't fold into each other. I mean, looking at the government's ability to deal with harm presupposes that there is harm. And my question presupposes that there is harm. But then I guess I'm maybe stuck on this one issue, but it seems to me that if that issue is supported by substantial evidence, the game is over. If the government is sufficiently willing and able to try to protect individuals who suffer this kind of targeting, then we would have to deny the petition, wouldn't we? I know you don't agree with the premise, but if the premise is correct, wouldn't we have to deny the petition? If it was truly shown that there was effective efforts by the government, yes, that would be correct. And in order to find in your favor, we would have to determine that every reasonable fact finder would come to that conclusion under our standard of review, wouldn't we? That would be true, except, again, I would point back to the fact that the misrepresentation of the authority that the agency uses to support its conclusion reflects that it was applying an incorrect standard. And effectively, the judge talked about there was good faith efforts being made. The Board of Immigration Appeals, in misciting those, said it's sufficient if the government doesn't condone and takes reasonable steps. I think they're conflating whether the government tries at all with whether the government tries effectively. And I don't think the one-off instance of the police happening upon the shooting after the shooting had, as the shooting was occurring, rather, is reflective of effective evidence. And I think the other country conditions evidence that... The BIA opinion says that the police made inquiries into the interrupted shooting. Does the transcript show that? Does the record show that they actually made inquiries? There's nothing in the record reflecting the result of the investigation. There are photographs that were taken that were passed along to a petitioner that were taken at the crime scene showing there were police there. And, again, that's not in dispute that the police were there, but I don't think that reflects that they were effectively able to protect the petitioner. I'm asking about the accuracy of the facts as recited in the BIA opinion. Did they make inquiries into the interrupted shooting as opposed to... I would say that's an inaccurate reflection of the record, Your Honor. And did they interrupt the shooting? I mean, there was still shooting when the police arrived? There were 30 shell casings that were collected. So I would say, in a sense, they interrupted perhaps what could have been more shooting, but I wouldn't say that they interrupted the actual shooting given the amount of shots that were fired. Just so I understand, because most of the briefing was whether or not to extend or narrow or stand by Enriquez-Rivas, but on this particular issue, am I right that your argument is that the BIA opinion, you think, legally erred, misapprehending that efficacy has to be looked at rather than just sort of willingness? I do. But aren't you also saying, factually, once the I.J. credited the testimony here, the testimony leads to no inference other than that the only reason he gets shot at, sprayed with an AK-47, is because the police themselves must have leaked it. So there is this sort of twisted aspect to this particular element, which is the only reason the man is being shot at behind a trash can is because the police themselves somehow couldn't keep cooperator information private. I thought that was essential to your argument on the error on the second element that's sort of secondary. Yes, it is, Your Honor, and I think it's strongly reflective of their inability, despite, again, the immigration judge talks about the good faith efforts they took to protect petitioners' anonymity, but mere days later, he was receiving death threats. And wasn't the unanimous testimony, again, that was credited that somehow the gang had found out that he went to the police and offered to set up a sting? I felt that. So, again, I don't see how there could any reasonable person could construe the police as protecting him when they're the ones that caused the shooting. I would agree with that, Your Honor. And there's at least no finding to the contrary, right? That's correct, Your Honor. My problem is sort of, again, back on the Henriquez point. It's a sweeping ruling. It's 2013. It was a pretty lopsided en banc court ruling. But, surprisingly, there's really no court that's issued a published decision extending it to people that report and cooperate as opposed to highly formalistically those who do testify. So you'd be asking us to take a step beyond. Is that fair to say? That is fair to say, Your Honor. I would note that. How confident can we be to do that? Is it just on the logic of it? I think the logic behind Henriquez-Rivas as it applies to whether a group is defined with sufficient particularity and social distinction is illustrative in this case. If you do get into floodgate problems, the government's right to say that. How are we going to distinguish people who just call 911 and express a willingness to be a good citizen from those that call and say, why don't you come stake out my store? I think the line that would delimit who's in the group and who is not, that would delimit the group is the existence of official documents, in this case, a police report. But to me, the critical difference here from people who just call the police is that he was actively cooperating. That's true, Your Honor. And that is in the delineation as articulated, i.e., people who cooperated with the police, not just people who report to the police. That's true, Your Honor. And that goes to the point as well that this is, and regarding the social distinction question, the witness protection laws, which Henriquez-Rivas cited as a strong indication that a society recognizes a group as being socially distinct, apply to people who are participating in the criminal process, not just people who are testifying at trial. And the document that's in the records calls them, what, protected? The police report lists him as a protected witness complainant, which is, again, a strong indication that he falls within that socially distinct group. A lot of pressure on that word, a form stamp, protected, because if it were just witness complainant, cases like Escobar, you probably know the case, Pineda, unpublished last year, wouldn't qualify. So it's got to be that word, protected, that creates the social visibility? I'm not entirely familiar with the facts underlying that case, since it was unpublished and it was, but you remember. Certainly in an American society, there is a perceived difference between people who call the police and complain about a crime, and even of which they're the victim, and people who actively are informers or cooperators. And that seems to me to be the key distinction here. That's correct, Your Honor. Did the BIA also say, well, even if you do cooperate, sadly, as we know in America, that's a highly immutable characteristic. People choose to stop cooperating. The question of whether there's an immutable characteristic lies in the shared past experience, in that he had already cooperated at that point, and that's why he was targeted. And he had stopped cooperating. He was in hiding for five weeks by the time he was shot at. So I don't think that there's any immutability issue here. If I could just ask you, because there's so many elements to this case and time's thin, it seemed to me the BIA also was saying it would have been reasonable to relocate. And we know that once he goes to his cousin, no problem. He goes to his sister, no problem for weeks. It can't be that a petitioner just says, well, I was in hiding there, so I had no problem. That can't be the law that, therefore, that defeats reasonable ability to relocate, just when you say, well, I decide not to go out of the house. Can it? Without more, no, that wouldn't be sufficient. But what's more, because during all those weeks, the M18 gang never did anything. The country conditions evidence reflects that the M18 gang is the second largest in Honduras, that the gang presence is prevalent. He testified that he was in hiding because he knew there were active members of the M18 gang in the vicinity, which is why he didn't dare set foot outside. He said once you intone M18, relocation is not an issue in the case because they're countrywide. I don't think that could be the law either. So it comes back to him saying, well, I was in hiding. The standard is whether it was reasonable for him to remain. And he did. But I would argue that it's not reasonable to expect him to remain in hiding for the rest of his life. It comes back to then anyone can defeat that element if they just say I stayed indoors. If there's ample country conditions evidence to support that there is that pervasive danger throughout the country, I would say yes, Your Honor. You're down to about a minute and a half, if you'd like to save it. I see that, and I would like to reserve the rest of my time for rebuttal. You may do that. Wow. A large increase. May it please the Court, Your Honors. Tim Remitz on behalf of the United States Attorney General. This immigration case, there are three issues. Could you speak up a little more loudly and slowly, if you don't mind? Yes. I lost you already. May it please the Court, Your Honors. Tim Remitz on behalf of the United States Attorney General. This immigration case, there are three issues. The particular social group issue, unruling and unable to relocate, and the relocation issue. Any one of these issues Rather that you're throwing in the towel on some of the others, which do seem fairly ridiculous, i.e. that he wasn't, in fact, persecuted. Past persecution and nexus. And he wasn't persecuted, and the fact that he was shot didn't have anything to do with this nexus. We believe the agency overlooked some Ninth Circuit case law in those issues. As well as the facts. Yes. They also believe that the shooting didn't bear evidence that it was directed at petitioner, and we believe that should be looked at again. Okay. Let's focus on the issues that remain. So, as the Court recognized, any one of these issues could be dispositive of petitioner's claims for asylum and holding of removal. The government would like to start with unwilling and unable, because we believe that is the strongest case for the government. So the standard of review is the record has to compel the conclusion that this evidence showed that the Honduran police were unwilling or unable to protect him. I don't believe we're arguing about that. But what about the first problem, which is, were they applying the right standard? I mean, I had the same impression that they were not. They quote, they say unable or unwilling, and they then quote two, make two parentheticals, which do not contain the unwilling, the unable part. And then they go, I mean, is that much accurate? I would say however they misquote those cases, which they do misquote Berrios. But it's not only that they misquote the cases. It's that they misquote them in a way that demonstrates what standard they believe the standard to be. I think the rest of the decision shows they know what the standard is and they properly apply it. Well, I'm not sure that's true. Well, they cite Doe on page AR6, which specifies unable or unwilling without any fanfare. I would also point out that Petitioner's argument is not about the willingness of the police. It's really about the efficacy, and we heard that from Petitioner in his oral argument. And the Board does address efficacy. So if he's claiming that they miscited these cases, they nonetheless addressed efficacy. They acknowledge the police's efforts to have his police report be anonymous. They acknowledge his claims or testimony that nonetheless the gangs found out or inferred that he was working with police. And they acknowledge these efforts the police took to address these and what efforts were taken. So whatever that was misquoted in that citation, the Board nonetheless looked at efficacy, as Petitioner's stating they did not do. On AR6, the BIA also says that the respondent, now Petitioner, does not allege police corruption in a cite to the transcript and some exhibits and so forth. Is that statement supported by the record? Yes, that statement is supported by the record. Petitioner never alleged it was police corruption that led to the gangs inferring that he was working with this investigation. So they found out, but at least on this record, not through the police themselves? No evidence of that, Your Honor. What we actually have is a credible fear interview from Petitioner. When he was first asked about his claim by United States authorities, and they were asked, how do you think the gangs learned that you were working with police, his first explanation was, I believe they saw strange cars pulled up in my welding shop and strange people there, and they inferred that I was working with police. He never stated that it was police corruption. And, in fact, what he stated in his testimony was that he was working with a special anti-extortion unit of the police that made these reports anonymous with the particular goal of not having local police, which are subject to corruption in Honduras, from obtaining that police report. But the corruption would go to unwilling, but it wouldn't go to unable. Correct. Is the factual statement in BIA that they made inquiries into the interrupted shooting accurate? Yes, that is accurate. Where is the evidence that they made inquiries into the interrupted shooting? Well, we have two pieces of evidence. We have the photos that show police on the scene investigating, and we also have Petitioner's testimony. Who took the photos?  But who took the photos? His friend, who told him later, and this is in his testimony. He said his friend related to him that this was investigated by the police, and his friend provided him with these photos because his friend was also a journalist, and that's how he learned about this investigation. That they were investigating or they were there? That they were there. There. Investigating after the scene or taking a report, and police were on the scene investigating the police report. The testimony from whom are we referring to? I believe it's Petitioner. He says at page 187 in the transcript, police respond to the scene after hearing shots, and this can be seen in the photograph. So what we have at every turn, when police were given the opportunity to help Petitioner, they more than capably protected him. When he first reported these threats to police, they sent undercover officers to his welding shop two days in a row, 90 minutes apiece, to help identify the people that were threatening him. But wait a minute. The testimony is on page 187. Did they conduct an investigation? No, because no, nobody reported anything. Are they only the shots were heard? The evidence is not that they did conduct an investigation. It's that they didn't conduct an investigation. He says he never reported the shooting himself. No, but that's an addition. But did they conduct an investigation? No. But he also says that they did. He doesn't know if they did an investigation at most. He said no, because nobody reported anything. He never reported anything. The BIA at five and six also says that the fact that the police could not further investigate the shooting without witnesses does not demonstrate that the government is unable or unwilling. No, it's just all I'm saying is that that factual statement seemed incorrect, not supported by the record. Well, I think there also the immigration judge relies on that photograph, and that photograph shows police on the scene at the shooting, after the shooting. Well, we know they were on the scene. They came and they bantered away, and they were there. We know that. Well, that testimony is about a police car that scares off the attackers, and then later on there's police at the scene being photographed investigating the bullet holes. But it always scared them off after they shot him. It was just kind of an accident that he didn't get killed. Well, that happens in the United States as well. Like a sudden act of violence can happen on the street, and luckily a patrol is there to capably address the violence. Well, they didn't capably address the violence. The violence had already occurred, and they didn't investigate it. And so it doesn't seem to me to tell you very much about whether they were able to control the violence. It may show they're willing, but it doesn't show they're able. I think the violence was occurring, and police stopped it. And that's according to Petitioner's own testimony. After 30 shots. After 30 shots. He said it was an assault rifle, and it took place in a matter of seconds. They sprayed 30 shots in a matter of seconds, and police were then on the scene to intervene. That's, as the panel pointed out, a very good response even in the United States. I mean, lurking behind this case is a very big issue of the Enriquez-Rivas standard. Yes. So I'm a little surprised OIL is defending this BIA ruling that seems riddled with, you're agreeing it is persecution, the court was wrong about Nexus. It sounds like you've agreed orally that they miscited Madrigal and Barras, whether they applied it or not. It's not a great vehicle to make a big decision about the scope of Enriquez. Would you be agreeable to a remand to clearly look at efficacy? In other words, if they miscite Ninth Circuit law, do we really want to pick out and say, well, they must have meant this? It looks to me like the police were willing and hopeful to investigate this. But clearly they failed miserably. He gets sprayed with an AK-47. And it's a fair inference also that the only reason he gets shot at is because the police couldn't protect the cooperators. It leaked. So why not have an exploration where they're citing Ninth Circuit law correctly rather than reaching this very big and difficult issue about Enriquez-Rivas? Enriquez-Rivas really plays a part in this case, I think, with a particular social group. I know it could, but that's a big ruling if you agree with opposing counsel, that we've never extended it beyond a formal witness. So if we have such difficulty with half of your oral argument time about were they willing but unable, but maybe can we see an ability even though the BIA miscited Ninth Circuit law, that to me sounds like it ought to deserve a remand so they cite the law and apply it correctly. I think we have to separate Enriquez-Rivas when recognizing a particular social group. Oh, we have to get there no matter what. Well, I'm saying that that is a large ruling, what constitutes a particular social group. This is a separate issue of unwilling or unable, which could just apply. You have to go through the first to get to the second? It could just apply to the facts on this case. As I understood your argument earlier, any single one of those rulings would suffice without reaching the other issues, social group or unable, unwilling, or relocation. Correct. So if any of those is supported, then game over. So you wouldn't have to reach social group to reach the other two. Correct, and that's why when we acknowledge past persecution and nexus, we will still go forward with the case because we have other dispositive issues, as we do with many other cases. But you've picked as your strongest one that actually has to be second to social recognition. We would never get to police inability. No, I think these are independent claims. To affirm. To affirm. So unwilling or unable does not mean that the entire Honduran police is always going to be willing and able to protect on the facts of this case. This is sort of a strange comment, but I must say that given the fact that I think it's commendable that the Department of Justice is not defending the other bases, but the notion that both the IJ and the BIA made what are just, to me, indefensible decisions in those regards certainly undermines one's confidence in what else they've done here. I mean, the Enriquez thing is a separate legal issue. But on the unable and unwilling, it seems to me that they were operating from some strange place, in this case, in general. So that reinforces the notion that then they go and they misstate Ninth Circuit law in a way that suggests that they're not applying the right legal standard. One would think that maybe they do need to reconsider it. But do you want to briefly address the Enriquez thing? So social distinction. You have to have society-specific evidence showing that, in this case, Honduran society recognizes this group of former witnesses who have cooperated with police against gangs, is socially distinct and recognized as a group set apart by Honduran society. And so Petitioner is trying to fit this within Enriquez-Rivas. But there's two problems with that. First of all, that was a different society. That was Salvadoran society and evidence specific to Salvadoran society in that case. But the evidence, I mean, he was, as far as the police were concerned, in a distinct group. They called him something different, i.e., a protected witness. And there is some protection, parallel protection, as I understand it, to what existed in Enriquez-Rivas in this instance. So Enriquez-Rivas said there's significant evidence that the witness protection program applied to the people who testified at trial in El Salvador. But not necessarily to that particular guy. It didn't limit it at trial. That's correct. But here we have Honduran witness protection laws that don't clearly, at least with the standard review, don't seem to apply to Petitioner. Why is he called a protected witness? I think we're looking at that complaint and we're putting much too much weight on what it says at the top of that complaint, protected witness, because it could very easily refer to the fact the complaint is redacted. The information inside that complaint is protected. All the identifying information is protected. As part of police's efforts to protect him from gangs, they kept this as an anonymous complaint, kept away from the local police, and filed only in this anti-extortion unit. And he was also an active cooperator. He wasn't simply reporting, right? And, in fact, the reason why he ended up in trouble, it appears, was because the police, with his agreement, came to his shop and were not recognized. He cooperated with authorities and he did let them investigate. When we're talking about social distinction, we have to look at society as a whole, whether they set this group of people aside. And if he's not subject to witness protection laws— Well, these two people seemed—I mean, his girlfriend seemed to think that this was— he had put himself in some recognizable group. That's correct. And the person who warned him as well. So there was certainly direct evidence that he was being treated. Well, I think that would be the old rule about social visibility. They recognized him personally. They saw him as someone who had been threatened by gangs. That's social visibility. And we're talking about social distinction. The only thing that gets him squarely in Enrique's is if the government indicts and the government gives him a trial subpoena. He can't do anything about either of those actions. That's correct. So once they indict and once they put a subpoena on him, he squarely fits. Because that would be saying that under the logic of Enrique's rigas, that society has chosen to recognize him as a member of a protected group because the laws recognize him as a member of that group. So if the laws don't recognize him in Honduras as a member of this protection program, then he doesn't meet Enrique's rigas. He hasn't shown the laws separate him out for protection as a particular social group. And we don't have that in this case. We have background evidence on the Honduran witness protection program, which by all indications seems to only apply to witnesses at trial. So he wasn't a witness at trial. An investigation was very preliminary. A prosecution never started in this case. So we can't show there's laws that protect him. And moreover, there's documents in the record that indicate that it's not so much that they're recognizing this group, that the witness protection program is meant to assist the gang violence problem that's endemic in Honduras. It's meant to provide for successful prosecutions. Well, the witness protection document that's in the record seems directly to contemplate that there doesn't necessarily have to be a trial, right? I wouldn't say necessarily. Well, submission of a request made by the public prosecutor in charge of the investigation or the trial indicate that the implementation of security measures in favor of the witness or persons collaterally affected proceeds. And if you go further in the document, when it goes about two or three paragraphs down, it talks about who else is subject to this protection. It states the family members of witnesses who testify. So it seems to be contemplating the fact that a prosecutor is going to select someone for this program because they have a criminal prosecution started, which has not started in this case yet. He's had an investigation, and for witnesses who testify. And there was no testimony in this case. There's no prosecution yet. So there's no indication, at least the record doesn't compel the conclusion, that he would be protected by these laws. I'm sorry. Could you tell me where that paragraph is? I don't see it. Yes, I could. Do you have the page, the record page in front of you at this moment? Yes, 298 is the one I was on. 298. Oh, excuse me. It's on 297. It's some preceding paragraphs. So it says in the second paragraph, or the third paragraph, the program's protection extends to the spouse, common-law partner, et cetera, who are threatened due to the witness's testimony. Well, you're assuming the testimony means at a trial. Well, I mean, this is all based on assumptions at this point, that he's assumed to be part of this program, but that's not the standard of review. He has to show the record compels the conclusion that these laws would be protecting him, not simply an inference. But the sentence I'm referring to makes clear that it doesn't have to be a trial, which is the investigation or the trial. Well, also, there's another item in the record, the Insight, a report from a group called Insight Crime. This is at 302. And it simply seems to envision that when it talks about witness protection program, that this applies to the prosecution itself, to people that are going to assist in the prosecution, because they're saying that it's endemic. And they do recognize people who file police reports in that same article, and they say they are potentially witnesses in the criminal prosecution. So we need to show them that the witness protection program is effective during the prosecution. Thank you, counsel. You've exceeded your time, and I think we understand your arguments. Thank you. And I believe you have some rebuttal time remaining. Thank you very much. Regarding the issues that the government has argued are dispositive, one of them was relocation. However, I would like to point out that because the agency erroneously found that there was no past persecution, it didn't properly shift the burden to the government to show that internal relocation would be unreasonable. So we'd have to remand on that basis? We'd have to remand? I don't think we have to, but I think that is a basis to remand. I think the record evidence compels the conclusion that even if the burden were on the Petitioner, that the internal relocation is not feasible given— But that would depend on affirming the Henricus Rivas issue. Yes. If there's no cognizable particular social group, there can be no past persecution. That's a threshold issue as well. It's also true on the relocation question that whether or not there might have been evidence on the relocation in general, what they relied on was simply the fact that he wasn't hiding for this time. And that doesn't prove that he could relocate and not be in hiding, but maybe he could. I mean, we just don't—they really didn't look at that question separately. That's correct. The standard is not whether someone was physically unharmed during that period. I would argue that there was also obviously emotional, psychological harm that he was experiencing being in hiding during that period as well, but that's correct. And going off of your line of questioning, Judge Berzon, and the social distinction, I would point out that 297 describes the witness protection laws as applying to witnesses in the criminal process, which is a more expansive range than just witnesses who testify at trial. And I see that my time is up. Thank you very kindly. The case just argued is submitted, and we appreciate the arguments from both counsel.
judges: Graber, Berzon, Higginson